## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JERMAINE KELLY,

                                   **CASE NO. 2:19-CV-01984**

    **Petitioner,**                        **JUDGE MICHAEL H. WATSON**

                                   **Chief Magistrate Judge Elizabeth P. Deavers**

    **v.**

WARDEN, PICKAWAY
CORRECTIONAL INSTUTION

    **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is before the Court on the Petition, Respondent's Return of Writ, Petitioner's Traverse and Supplement to the Traverse, and the exhibits of the parties.  For the reasons that follow, the undersigned **RECOMMENDS** that this action be **DISMISSED.**

### I.  Facts and Procedural History

Petitioner challenges his convictions after a trial in the Delaware County Court of Common Pleas for murder, intimidation, and having a weapon while under disability, with specifications.  The Ohio Fifth District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 3} On July 22, 2016, the Delaware County Ohio Grand Jury returned a joint indictment against co-defendants Jermaine Kelly and Reginald Conley. The indictment charged Appellant Kelly with two counts of Murder; Count One in violation of R.C. § 2903.02(A) and Count two in violation of R.C. § 2903.02(B), both unclassified felonies, Count Three: Intimidation of a Witness, in violation of R.C. § 2921.04(B)(2), a third-degree felony, and two counts of Having a Weapon Under Disability in violation of R.C. § 2923.13(A)(4). Counts One, Two, and Three also each carried a Gang Affiliation Specification in violation of R.C. § 2941.142 and Firearm Specifications, in violation of R.C. § 2941.145.

{¶ 4} Prior to trial, the defendants moved to sever their trials. Following an evidentiary hearing, the motions were denied. The trial court also held an evidentiary hearing on the defendants' motions in limine to exclude evidence of Conley's involvement in a double homicide with Gervins. Again, the trial court denied the motions.

{¶ 5} Appellant waived his right to a jury trial as to the gang specifications related to Counts One, Two, and Three, and his right to a jury trial as to the having weapons under disability charges. Those charges were tried to the court. The murder and intimidation charges along with the firearm specifications were all tried to a jury, with the trial commencing on March 6, 2017 and continuing through March 7, 8, 9 and 10, 2017. At trial, the jury heard the following account of the events which took place on November 9, 2012, which led to the above charges:

{¶ 6} Victoria Hilbrands testified that on November 9, 2012, she lived at 6901 Redbank Rd. in Galena, Ohio. Around 5:30 P.M. she heard a loud banging on the door. T. at 254–255. She could not initially see anyone outside the door. However, she heard a man, later identified as Dontee Gervins, yelling that he had been shot and asking to be let in. T. at 256. Mrs. Hilbrands immediately called 911. T. at 257. That call was placed at 5:43 P.M. T. at 284. While on the phone with 911, Mrs. Hilbrands could hear Gervins on his cell phone. Gervins repeatedly said "I won't tell anybody" to the person with whom he was speaking. T. at 260.

{¶ 7} Gale Dunlap testified that she lived on Gorsuch Rd. This is a short distance from the Hilbrands' residence on Redbank Rd. T. at 346–347. On November 9, 2012 Dunlap was returning home from work sometime after 5:00 P.M. when a vehicle pulled out of the Hilbrands driveway. The vehicle exited the driveway in a manner that forced her to brake her vehicle. T. at 350. She described the vehicle as a light blue or gray sedan but could not identify who was driving or how many occupants were in the vehicle. T. at 351. Mrs. Dunlap was behind the vehicle for a short period of time. During this time, the vehicle failed to stop at two stop signs. T. at 353. Around this same time Mrs. Dunlap saw a squad traveling toward the location where the shooting had occurred. Mrs. Dunlap was unable to positively identify the vehicle but testified it was consistent with that later found to be used by Reginald Conley. T. at 356.

{¶ 8} Deputy Charm Johnson (also referred to in the record by her maiden name as "Charm Miller") testified that she was the first person to arrive at the Hilbrands' residence after the shooting. T. at 284–286. She arrived at approximately 5:50 P.M. T. at 299. Dep. Johnson found Gervins laying on the front porch of the Hilbrands' residence. T. at 286. Gervins appeared very weak, indicated he had been shot, but was unable to verbalize his name or other information at that time. T. at 286. Gervins' cellphone was lying next to him on the porch and Dep. Johnson could hear a female voice on the line. T. at 287. Shortly thereafter, Dep. Johnson notified medics that the scene was safe and they could approach to aide Gervins. T. at 288.

{¶ 9} Brooks Church testified that he was one of the first medics who arrived at the residence. T. at 326. Church described Gervins as scared, very alert, barely able to speak, but could speak a little in between breaths. T. at 328. Church asked Gervins where the shooting occurred. Gervins responded "here" and gestured as if to indicate near the residence. T. at 330. When asked, Gervins indicated that he knew who shot him. T. at 330.

{¶ 10} Detective Charles Gannon was the first officer to arrive on scene after Deputy Johnson. He testified he became involved in the investigation at 5:42 P.M. on November 9, 2012. T. at 1190. He was on his way home when the 911 call was placed, but he was the closest detective to 6901 Red Bank Rd. T. at 1190. When Det. Gannon arrived at the scene, medics were working on Mr. Gervins and he was still alive. T. at 1194. Shortly after Det. Gannon arrived, Gervins' cellphone began ringing and "Wifey" was displayed as the caller on the screen of the cell phone. T. at 1200. Det. Gannon had a brief conversation with Amber Bland and ended the call to continue his work on the scene. T. at 202–1203. Det. Gannon finished assisting processing the scene and documented what occurred. T. at 1203–1212. After his work at the scene was completed, he drove to Riverside hospital. T. at 1217.

{¶ 11} At the hospital, Det. Gannon learned that Dontee Gervins had been living with his fiancé, Amber Bland, on the near-east side of Columbus, Ohio. T. at 376. Gervins was selling marijuana to pay the bills and was associated with a gang called the Bloods. T. at 377. During this same time frame, Ms. Bland informed him that Gervins and her brother (Richard Bland) were closely associated with a man named Reginald Conley. T. at 378. He learned Conley went by the street name "Twice." T. at 378.

{¶ 12} Ms. Bland explained that late in the morning on November 9, 2012, Gervins and Ms. Bland ordered pizza and "chilled" at their residence with his friend "Blaze" (later identified as Domino Mack) and Blaze's girlfriend. T. at 379. After they finished eating pizza, Gervins received a phone call and stated that he had to leave but would be back. T. at 380. Before Gervins left, Ms. Bland heard him go into the laundry room and retrieve an unknown quantity of money from a safe in the ceiling. T. at 381–382. Shortly thereafter, Gervins left with Blaze and Blaze's girlfriend. Ms. Bland then fell asleep with her children. T. at 383.

{¶ 13} Several hours later, Ms. Bland was awoken by a phone call from Gervins. T. at 383. When she answered the phone, he immediately stated "Babe, I've been shot" and hung up the phone. T. at 383. This call was placed at 5:44 P.M. Ms. Bland immediately called him back and had a short conversation with him. Gervins sounded scared and out of breath. T. at 384.

{¶ 14} When Ms. Bland called him back, Gervins stated that he had been shot and that he was in New Albany. When Ms. Bland asked if he knew who shot him, Gervins stated that it was "Ice" who shot him and that she was not to tell anyone.

She stayed on the phone with him until the paramedics arrived a few minutes later and the phone was hung up. T. at 385.

{¶ 15} Ms. Bland went to the hospital to be with Gervins and was accompanied by a number of his friends and family. One individual she spoke with at the hospital was "Blaze." T. at 387. Because "Blaze" was the last person she had seen Mr. Gervins with that day, she spoke with him about what had transpired. She then provided that information to Gervins' sister (Dena Bronaugh) and to detectives from the Delaware County Sheriff's Office. T. at 387– 388.

{¶ 16} Ms. Bland stayed with Mr. Gervins at the hospital most of the week that followed the shooting. During that time he was intubated and unable to breath without the assistance of a tube down his throat. Ultimately, Mr. Gervins succumbed to his injuries on November 18, 2012. T. at 389.

{¶ 17} Dr. Gerston testified that Gervins was shot in the lower-mid back. The bullet travelled at an upward trajectory perforating the liver and the right lung of Gervins. T. at 472–474. This would have caused continuous internal bleeding, difficulty breathing, and immobility in a matter often to fifteen minutes. T. at 475. Despite efforts to save Gervins' life, he ultimately died as a result of the gunshot wound to the back. T. at 477.

{¶ 18} In the days immediately after the shooting, Detectives from the Delaware County Sheriff's Office began to make use of the leads provided by Gervins' family at the hospital. Det. Gannon used the contact information provided by Gervins' family and subpoenaed Conley's call detail records for the relevant timeframe. T. at 1219–1220.

When he received information that Jermaine Kelly may have been involved in the shooting, he obtained historical cell phone records for Kelly as well. T. at 1221. Det. Gannon also subpoenaed Gervins' cellphone records.

{¶ 19} The records identified numerous calls between Conley and Gervins and between Conley and Kelly on the date of the shooting. These records were ultimately given to Det. Moledor for cell phone mapping. T. at 1223. Det. Moledor was able to map the locations of cell phones belonging to Dontee Gervins, Jermaine Kelly, and Reginald Conley around the time Gervins was shot.

{¶ 20} Generally speaking, all three phones were in the area of the Wilson Market on the near east side of Columbus approximately one hour before the shooting. Between 5:00 P.M. and 5:45 P.M. all three phones can be seen traveling northbound out of Columbus. At 5:33 P.M. Kelly's phone connected to a cell phone tower approximately 2.7 km. from the location of the shooting. That tower would have been the closest to Kelly when the call was made. T. at 981. By approximately 6:00 P.M. Kelly and Conley's phones can both be seen traveling southbound back into

the Columbus area. No data from the cell phone mapping was inconsistent with Conley and Kelly being present at the shooting on Redbank Rd. T. at 985.

{¶ 21} Around the time of Gervins' death, investigators were attempting to identify possible suspects and motive for the shooting. Det. Gannon learned that approximately ten days prior to the shooting, Gervins had been involved in a shooting on Gault St. in Columbus. Det. Gannon obtained records from Columbus Police regarding the Gault Street shooting and learned that Gervins was suspected as being the driver in a robbery that ultimately resulted in the death of two individuals. T. at 1238. The information indicated a man named "Twice" was also involved in the Gault St. shooting. The fact that both shootings involved someone with the street name "Twice" and Gervins led him to interview Mary Page and Jonathan Dantzler. T. at 1239–1240.

{¶ 22} Mary Page testified that in 2012 she allowed Gervins to sell drugs out of her residence. T. at 732. This residence was across the street from an apartment complex on Gault St. in Columbus, Ohio. T. at 734. Page testified that in the days leading up to the death of Gervins, men identified as "Twice" and "Jesus" (whom she later identified as Jonathan Dantzler) came to her residence with Gervins. T. at 734–736. "Twice" and Dantzler asked Page to knock on the door of a crack dealer she knew in the Gault St. Apartments. The plan was that Conley and Dantzler would then rob the dealer at gunpoint, while Gervins would remain in the car to facilitate their escape. T. at 735, 739–740.

{¶ 23} Page explained that when she, Dantzler, and "Twice" approached the door to the residence, she knocked on the door and inquired of an occupant if she could buy drugs. When she was told no by the occupant, she asked to use the bathroom. T. at 739. When she was told she could not use the bathroom, "Twice" and Dantzler began shooting into the apartment and went inside. Page did not enter the residence and instead fled the scene.

{¶ 24} When Page arrived home, she saw "Twice" and Dantzler get into the car with Gervins and drive off. T. at 740. Page explained that when she saw "Twice" and Gervins later in the day, "Twice" told her not to say anything and told her to implicate two dark skinned guys if questioned about the robbery. T. at 743. At this time, Gervins gave her some drugs. Neither Gervins, Dantzler, nor "Twice" were dark skinned. T. at 744.

{¶ 25} Later that day, Page learned that someone had been killed in the shooting and one person was critically injured. T. at 743. Shortly thereafter, Columbus Police arrived at her home and arrested her for her involvement in the robbery. She initially told investigators it was two dark-skinned guys who put her up to it, but decided to tell the truth a few moments into her six minute interview. T. at 745. She later identified Gervins as the driver, Dantzler as "Jesus", but did not know who "Twice" was. T. at 756. Page ultimately pled guilty to manslaughter with a firearm specification and testified against Dantzler at his trial. T. at 728–729.

{¶ 26} Dantzler testified that he was convicted for two counts of homicide arising out of the Gault St. shooting described by Mary Page. T. at 1072. He stated that on the day of the Gault St. shooting, he went to the Gault St. residence in question with Reginald Conley ("Twice"), Gervins, and Page. T. at 1075. Dantzler explained that Gervins drove him, Conley, and Page to the Gault St. residence and that Gervins remained in the car while Page, Conley and he went up to get drugs from the apartment. T. at 1076. Dantzler was arrested a few days after the shooting.

{¶ 27} On the day Gervins was shot, Dantzler was incarcerated awaiting trial for the Gault St. shootings. T. at 1072. While incarcerated, Dantzler placed a phone call to his brother Jermaine Kelly (who goes by "Mac Maine" and "Maine"). T. at 1069, 1073. On that call, Kelly informed Dantzler that he was "just with Twice." Kelly then stated "I hope we shoot good." Kelly then informed Dantzler that they "shot a little deer." T. at 1168–1169. This call was placed on November 9, 2012 at 6:34 P.M. and occurred less than an hour after Gervins' shooting. In a call to his mother, Kelly acknowledged his participation in this call. T. at 1160.

{¶ 28} As part of the investigation, investigators attempted to locate the vehicle described by Gale Dunlap. Det. Gannon testified he located a traffic citation issued to Reginald Conley in August of 2012. The ticket indicated Conley was driving a 2006 Ford Fusion, green in color, with a plate matching the one he borrowed from Christopher Hall. T. at 1232–1233. This prompted detectives to interview Christopher Hall.

{¶ 29} Christopher Hall testified that he knew Reginald Conley as "Reggie Two Times" and "Twice" in mid to late 2012. T. at 531. Hall explained that in 2012, he owned a green Ford Fusion that he had lent to Conley. T. at 532, 536. Conley had possession of the vehicle for at least several weeks. In late 2012, Hall received a phone call that he could retrieve the vehicle. T. at 537. However, Hall was unable to retrieve the vehicle because the Columbus Police impounded it prior to his arrival. T. at 538. This vehicle was later turned over to the Delaware County Sheriff's Office for processing. T. at 566.

{¶ 30} BCI Supervising Agent Gary Wilgus testified he processed the vehicle Hall provided Conley during the timeframe in question. T. at 566. As part of the processing of that vehicle, Agent Wilgus photographed the interior and exterior of the vehicle. T. at 568–.585. Additionally, he attempted to locate the presence of gunshot residue, blood, and latent fingerprints. T. at 571–594. He explained that had a firearm been discharged inside the motor vehicle, there would have been gunshot residue present. T. at 581. Ultimately, no evidence of gunshot residue or blood was located on the vehicle itself. T. at 590–591; 620.

{¶ 31} While no gunshot residue was identified on the vehicle itself, Agent Wilgus documented a blue Champion sweatshirt in the backseat of the vehicle he processed. T. at 571. When the sweatshirt was forensically processed, gunshot

residue and the DNA of Reginald Conley were found on it. T. at 637–644; 687–689. Daniel Steiner also testified that fingerprints lifted by Agent Wilgus from inside the vehicle were left by Conley. T. at 718.

{¶ 32} During the course of the investigation, Reginald Conley made some statements about what occurred in this case. When interviewed by Det. Gannon, he identified himself as "Twice." T. at 1241. He stated that on the date of the shooting, he received a call from Gervins. In response to that call, Conley met up with Gervins at the Wilson Market. He stated Gervins was brought to the market by "Blaze" (Domino Mack); the three waited there for the arrival of Conley's cousin. T. at 1243. After waiting with them for a short time, Conley claimed he walked to his grandma's house a couple blocks away. T. at 1244. Conley stated he had his phone with him all day and that if law enforcement checked the records it would show him at his grandma's house near Wilson Market. T. at 1248.

{¶ 33} In addition to speaking with law enforcement, Conley made statements to Ms. Bland about Gervins' shooting. Ms. Bland testified she saw Conley, whom she also knew as "Twice", on Near Year's Eve of 2012 at an establishment called "The Moonlight." T. at 392. When she saw him, he approached her and they discussed the shooting of Gervins. T. at 395. He stated he was with Mr. Gervins when he went up to Delaware on the day Gervins was shot. He further stated he had a gun on his person at the time Gervins was shot. T. at 395. Ms. Bland identified Mr. Conley in the courtroom as the person she knew as both Reginald Conley and "Twice." T. at 391.

{¶ 34} Conley made additional statements regarding the incident to his cousin Lamonte Rayford. Rayford is also the brother of Amber Bland. Rayford testified he learned that Gervins, his sister's paramour, was shot while Rayford was incarcerated in Franklin County. T. at 784. He explained his sister, Amber Bland, told him what she knew while he was at the Workhouse in Franklin County. This prompted Rayford to call "Twice" (Reginald Conley) from jail. T. at 787.

{¶ 35} During this call, Rayford discussed with Conley what had transpired with Gervins and the Gault St. shooting for which Dantzler had been arrested. T. at 795. Rayford commented to Conley that he heard Conley was out doing his "thug" too (meaning committing the same offenses as Dantzler). After laughing, Conley stated "they got my name in their mouth" (meaning individuals are accusing him of something). T. at 796–797. When the topic turned to the shooting of Gervins, Conley made some self-aggrandizing comments and then laughed when Rayford suggested Conley had left Gervins for dead. T. at 799.

{¶ 36} Finally, statements were presented that Conley made to fellow inmate Christopher Brookman. Christopher Brookman testified he was incarcerated at the Delaware County Jail with Reginald Conley while both were awaiting disposition of their criminal cases. T. at 921. Brookman explained that on one occasion an inmate "trustee" at the jail had a brief conversation with Conley, which caused

Conley to become upset. T. at 923–24. When Brookman questioned Conley about why he was upset, Conley stated he learned someone he knew on the street was going to testify that Conley had admitted to the crime for which he was awaiting trial. T. at 926. Conley then indicated that "he never should have trusted that weak-ass nigger. I shouldn't have never said nothing to him." T. at 927.

{¶ 37} Appellant also presented a number of Kelly's statements at trial. Detective Arthur Kester, III, testified he interviewed Jermaine Kelly on two separate occasions. He was first interviewed on December 14, 2012. T. at 1153. During the interview Kelly denied knowing anyone by the name of Reginald Conley, "Twice", or "Baby Twice." He further denied knowing an individual by the name of Jonathan Dantzler, "Jesus" or "Baby Jesus." T. at 1155. During the second interview with Kelly, Kelly requested to see the evidence against him. When the Detectives produced a binder and started to go through the evidence Kelly told them to shut the book and left the interview. T. at 1157.

{¶ 38} Months after Gervins' shooting, Kelly also made statements to Lamonte Rayford regarding Gervins' shooting. Rayford explained he met Kelly after his release from prison and knew him as "Mac Maine." T. at 803. Rayford testified he began to see Kelly daily at the "Taste of Chicago" pizza shop near where they lived. While Rayford described himself as merely an acquaintance of Kelly, he explained his cousin "Meme" (Demetrius Edwards) was very close to Kelly. T. at 806.

{¶ 39} Rayford explained that on one occasion, Rayford and "Meme" began discussing the Gervins shooting in the presence of Kelly. At that time, Kelly explained that Gervins had to be killed because Gervins was going "to tell on some shit that went down." Kelly explained that he had been the one who shot Gervins. He explained that Gervins was taken to Delaware to go get money, and told he had to switch seats in the car. When Gervins exited the car, Kelly shot him. T. at 807–809.

{¶ 40} As part of the investigation, law enforcement forensically processed the phones of Conley and Kelly. T. at 1113. The iPhone that was examined was associated with the phone number (614) 316–1329. It contained numerous messages suggesting Jermaine Kelly (Mac Maine) was using the phone in November and December of 2012. This phone was taken from Kelly's person upon his arrest. T. at 1125–1129. The phone was linked to a "Mac Maine" Facebook page with associated email addressed JermaineKelly82@yahoo.com and MacMaine.3@yahoo.com. Kelly's phone also included contact information for "Baby Twice."

{¶ 41} Detective Ullom also examined the Blackberry Curve associated with phone number (614) 701–0403 and taken from the person of Reginald Conley. T. at 1134. This phone and corresponding number were provided to law enforcement by Conley during his initial interview. T. at 1246. The data recoverable from the phone was quite limited as it appears that the phone was newly activated on November

18, 2012 at approximately 6:48 P.M. T. at 1136–1137. Det. Gannon testified that Conley activated the cell phone the same day Gervins died. T. at 1247.

{¶ 42} At trial, Appellee also presented the testimony of Richard Bland. Mr. Bland testified that he was the brother of Lamonte Rayford and Amber Bland. T. at 882. He testified the street name of Reginald Conley was "Twice" and was familiar with Jermaine Kelly being "Mac Maine." T. at 883. He explained that he didn't know Kelly very well, but that Conley was his cousin. T. at 885. He testified that around the time Gervins was shot, Conley was driving a greenish Ford Fusion that had a mirror missing on the passenger side. T. at 888.

{¶ 43} Appellee presented additional testimony relevant to the gang specification at trial. Lamonte Rayford, a cousin to Reginald Conley, testified he has been a gang member for most of his life in the Columbus area. He explained how individuals typically join a gang. He explained that one can commit a variety of offenses (i.e., sell drugs, rob people, or kill people) or they can be "blessed" into a gang if they have someone in their family with sufficient tenure and rank in the gang. T. at 774. He further explained that gangs typically have certain geographic territory within the city that can affect which gang individuals in the area join and one's family relationship has some bearing. T. at 775.

{¶ 44} Based upon where he lived and whom he was related to, Rayford testified he was a "Blood." However, he commonly associated with "Crips" who he knew to engage in robberies, drug transactions, and other illicit acts. T. at 776. In 2012, Rayford was associated with the "ATM Crips" ("Anytime Money Crips"); other members included "Twice" (Reginald Conley), "Meme" (Demetrius Edwards), "Van" (Conley's brother), and several others. The purpose of this gang was to get money by any means necessary. T. at 777–778. Reginald Conley had "ATM" tattooed on his body to identify himself as a member of this gang. T. at 779.

{¶ 45} Outside the presence of the jury, Rayford explained that back in 2012 he and Conley would consume and sell marijuana, codeine, methazine, pills, and powders together. T. at 867. He explained that they got money for drugs by "hustling" (selling drugs) and "robbing." T. at 868. On a number of occasions, he saw Conley sell drugs. T. at 868. Hall also testified Conley sold drugs to support his own habit. T. at 554:1–3. Rayford testified he committed a number of robberies with Conley in 2012. T. at 870. When asked for the names of specific stores they robbed together, he indicated he would rather not answer that question.

{¶ 46} Outside the presence of the jury, Dantzler explained that he was from Trevitt Heights, and the gang that controls that area is called the Crips. T. at 1085. He explained that he was a Crip and that there were certain colors and signals associated with the gang. T. at 1087. Dantzler explained that he would sell crack cocaine around his part of the city to make ends meet. T. at 1088. He explained that he also identified as an "ATM Crip." T. at 1090.

{¶ 47} At the close of the state's case, the prosecution voluntarily dismissed one of Kelly's weapon-under-disability charges, while the court dismissed Conley's weapon-under-disability charge pursuant to Crim.R. 29. The defendants were found guilty of all the remaining charges and specifications.

{¶ 48} At sentencing, the court sentenced both defendants to a mandatory term of fifteen years to life for the first count of murder, plus six years mandatory consecutive time for the firearm use and criminal gang specifications. The other counts were merged into the murder pursuant to R.C. § 2941.25. Additionally, as to Kelly, the court imposed a concurrent term of thirty-six months on the weapon-under-disability count. The aggregate prison term for both defendants was twenty-one years to life.

{¶ 49} Appellant Kelly now appeals, assigning the following errors for review:

ASSIGNMENTS OF ERROR

{¶ 50} "I. THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL AND CRIM.R. 14 BY DENYING APPELLANT'S MOTION TO SEVER HIS TRIAL FROM THAT OF CODEFENDANT.

{¶ 51} "II. APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO RENEW THE SEVERANCE ARGUMENT.

{¶ 52} "III. APPELLANT'S CONVICTIONS FOR MURDER, INTIMIDATION, AND HAVING A WEAPON UNDER DISABILITY, AND THE SPECIFICATIONS FOR FIREARM USE, VIOLATE APPELLANT'S DUE PROCESS RIGHTS BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 53} "IV. APPELLANT'S CONVICTIONS FOR MURDER, INTIMIDATION, AND HAVING WEAPONS UNDER DISABILITY, AND THE FIREARM *538 SPECIFICATIONS, ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE.

{¶ 54} "V. APPELLANT'S GUILTY FINDINGS ON THE CRIMINAL GANG SPECIFICATIONS VIOLATED DUE PROCESS BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 55} "VI. APPELLANT'S GUILTY FINDINGS ON THE CRIMINAL GANG SPECIFICATIONS ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE."

*State v. Kelly*, 105 N.E.3d 527, 530-38 (Ohio 2018). On January 30, 2018, the appellate court affirmed the judgment of the trial court. *Id*. On May 23, 2018, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Kelly*, 152 Ohio St.3d 1483 (Ohio 2018).

On May 15, 2019, Petitioner filed this *pro se* habeas corpus petition. He asserts that he was denied a fair trial because the trial court refused to grant his request for a severance of his trial from that of the co-defendant (claim one); that he was denied the effective assistance of counsel because his attorney failed to renew the request for a severance of trials (claim two); that the evidence is constitutionally insufficient to sustain his convictions (claims three, five and six); and that his convictions are against the manifest weight of the evidence (claim four). It is the Respondent's position that Petitioner has procedurally defaulted his claims or that they fail to provide a basis for relief.

## II. Procedural Default

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971). Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the

state courts, "there is a procedural default for purposes of federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. This means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. As the Supreme Court found in *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case—that is, they are "procedurally defaulted."

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction.

Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Id*.

In order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter,* 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Id*. at 452 (quoting *Murray*, 477 U.S. at 479). This is because, before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir.), *cert. denied*, 546 U.S. 1017 (2005). Or, if the claim is procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards*, 529 U.S. at 450–51. The Supreme Court has explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in *Coleman*: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S. Ct.

2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to "'protect the integrity' of the federal exhaustion rule." Id. at 848, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (quoting *id*., at 853, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by "'letting the time run'" so that state remedies were no longer available. *Id*. at 848, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].'" *Id*. at 854, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S. Ct. 587, 94 L.Ed. 761 (1950)).

*Id*. at 452–53.

If, after considering all four factors of the *Maupin* test, the Court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray*, 477 U.S. at 495–96), *cert. denied*, 135 S. Ct. 1545 (2015).

### III.  Claim One

Petitioner asserts that his convictions violate due process because the trial court refused to grant his motion to sever his trial from that of the co-defendant. The state appellate court rejected this claim as follows:

Appellant argues that the trial court erred in denying his motion to sever his trial from his co-defendant. We disagree.

{¶ 57} Defendants may be charged in the same indictment, pursuant to Ohio Crim. R. 8(B) as follows:

{¶ 58} Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count.

{¶ 59} The law favors the joinder of defendants and the avoidance of multiple trials because joinder conserves judicial and prosecutorial time, lessens the expenses of multiple trials, diminishes the inconvenience to witnesses, and minimizes the possibility of incongruous results from successive trials before different juries. *State v. Thomas*, 61 Ohio St.2d 223, 400 N.E.2d 401 (1980).

{¶ 60} In order to obtain a severance, a defendant needed to affirmatively demonstrate prejudice by the joinder. Crim.R. 14.

{¶ 61} Criminal Rule 14 provides, in pertinent part:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, information or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. In ruling on a motion by a defendant for severance, the court shall order the prosecuting attorney to deliver to the court for inspection pursuant to Rule 16(B)(1)(a) any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial.

{¶ 62} The United States Supreme Court has stated, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 1993. Even where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id*. Indeed, "[a] request for severance should be denied if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants." *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987). Thus, to prevail on his severance argument, an appellant must show "compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever." *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir 2005), *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008).

{¶ 63} When a defendant makes a pretrial Crim.R. 14 motion to sever, he is required to renew the motion at the close of the state's case or the conclusion of all the evidence so that the trial court can conduct a Crim.R. 14 analysis based on all of the evidence presented at trial. *State v. Rojas*, 6th Dist. Lucas No. L-11-1276, 2013-Ohio-1835, 2013 WL 1874826, ¶ 34. Failure to renew the motion forfeits all but plain error on appeal. *Id.*; and *see State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 23 (an appellant forfeits an error by failing to preserve an objection, but forfeiture does not extinguish a claim of plain error under Crim.R. 52(B).)

{¶ 64} We generally review a trial court's decision on a motion to sever for an abuse of discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. But when the appellant forfeits an issue we review only for plain error. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 62. Here, Reynolds's [sic] trial counsel failed to renew his motion to sever after the state presented its case or at the close of the evidence. Thus, he has forfeited all but plain error.

{¶ 65} Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error is not present unless the outcome of the trial would have been different but for the complained of error. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 78.

{¶ 66} Upon review, we find that the trial court did not err in denying the motion to sever as the evidence against both defendants was similar. The cell phone record evidence placed both defendants together with Gervins in the vicinity at the time the victim was shot. Phone records were also produced showing that Conley called Kelly after he set up the meeting with Gervins. Both defendants also had the same motive to silence Gervins; to keep him from identifying Conley (Kelly's cousin) as one of the shooters in the Gault Street shooting and from testifying against Dantzler (Kelly's brother).

{¶ 67} Thus, joinder was proper, and the trial court did not commit any error, let alone plain error, when it denied Appellant's motion to sever.

*State v. Kelly*, 105 N.E.3d at 538-39.

Petitioner has waived claim one by failing to renew the motion for severance at the close of evidence. The state appellate court therefore reviewed the issue for plain error only. *See*

*United States v. Davis,* 407 F. App'x 32, 39-40 (6th Cir. 2011) ("This Court has 'unequivocally stated that failure to renew a motion to sever at the close of evidence results in waiver of the motion.'") (citing *United States v. Allen*, 160 F.3d 1096, 1106 (6th Cir. 1998)); *see also Howard v. Turner*, No. 3:13-cv-405 2014 WL 11191049, at *10 (N.D. Ohio Sept. 8, 2014) (enforcing procedural default based on petitioner's failure to renew motion to sever at the close of the State's evidence, and the appellate court's subsequent plain error review); *Smith v. Warren*, No. 1:11-cv-083, 2012 WL 668608, at *11 (S.D. Ohio Feb. 29, 2012) (finding that the Ohio procedural rule requiring that a severance motion be renewed at the conclusion of the evidence is firmly established and is an adequate and independent state ground). Further, a state court's review for plain error only constitutes an enforcement of the procedural default. *Girts v. Yanai*, 501 F.3d 743, 755 (6th Cir. 2007) (citing *Seymour v. Walker*, 224 F. 3rd 542, 557 (6th Cir. 2000) (plain error review does not constitute a waiver of procedural default); *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005). Therefore, Petitioner has waived claim one.

## IV.  Cause; Claim Two

In claim two, and as cause for his procedural default, Petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to renew the motion to sever at the close of the State's evidence. The state appellate court also denied this claim:

> Appellant argues that he was denied the effective assistance of counsel. We disagree.
>
> {¶ 70} More specifically, Appellant argues that his counsel was ineffective in failing to renew the severance argument.
>
> {¶ 71} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant

was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180( 1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 ( 1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

{¶ 72} In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley. Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009).

{¶ 73} The United States Supreme Court discussed the prejudice prong of the *Strickland* test:

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*., at 687, 104 S.Ct. 2052.

Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

{¶ 74} *Harrington v. Richter*, 562 U.S. 86, 104–105, 131 S.Ct. 770, 777–778, 178 L.Ed.2d 624 (2011).

{¶ 75} The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged

deficiencies." *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d 373, quoting *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 76} Upon review, and based on our disposition of Assignment of Error I finding that joinder was proper in this matter and that Appellant was not prejudiced by same, we find Appellant has failed in his burden to demonstrate a reasonable probability that, but for counsel's failure to renew the motion to sever, the result of the proceeding would have been different.

*State v. Kelly*, 105 N.E.3d at 539-40.

In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland*, 466 U.S. at 668. *Strickland* requires a petitioner claiming the ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id*. at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir.), *cert. denied sub. nom. Hale v. Hoffner*, 134 S. Ct. 680 (2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 F. A'ppx 749, 754 (6th Cir. 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted)); (citing *Strickland*, 466 U.S. at 687), *cert. denied*, 135 S. Ct. 122 (2014). To make such a showing, a petitioner must overcome the "strong [ ] presum[ption]" that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 687. "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

This Court considers Petitioner's claim of ineffective assistance of counsel de novo when determining whether Petitioner can establish cause for his procedural default. *See Hively v. Warden*, No. 2:17-cv-222, 2018 WL 722864, at *7 (S.D. Ohio Feb. 5, 2018) (citing *Hall v. Vasbinder*, 563 F.3d 222, 236-37 (6th Cir. 2009) ("An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel. The latter must meet the higher AEDPA standard of review, while the former need not.") Nonetheless, the record reflects that Petitioner cannot establish a claim of ineffective assistance of counsel under the *Strickland* test.

The appellate court found that the trial court's decision denying the request for a severance complied with Ohio law. This Court is bound by that determination. *See Brenson v. Coleman*, 680 F. App'x 405, 409 (6th Cir. 2017) ("[W]hether a severance is appropriate lies within the discretion of the trial court."); *Veliev v. Warden, Chillicothe Corr. Inst.*, No. 2:12-cv-00346, 2014 WL 4805292, at *13 (S.D. Ohio Sept. 26, 2014) (citing *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) ) (this court must "defer to a state court's interpretation of its own rules of evidence and procedure") (citations omitted); *Bennett v. Warden, Lebanon Corr. Inst.*, 782 F. Supp. 2d 466, 478 (S.D. Ohio March 15, 2011) ("[T]he state courts are the final authority on state-law issues, the federal habeas court must defer to and is bound by the state court's rulings on such matters.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state law questions.")). Further, the record does not reflect that the trial court's decision violated federal law. "[A] criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial." *Fox v. Ward*, 200 F.3d 1286, 1292 (10th Cir. 2000) (citation omitted); *see also Cardenas-Borbon v. Burt*, No. 10-13548, 2014 WL 793629, at

*14 (E.D. Mich. Feb. 27, 2014) ("As a general matter, there is no constitutional right to severance.")  To the contrary, federal law prefers joint trials of co-defendants because it promotes efficiency and serves "the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  *Zafiro v. United States,* 506 U.S. 534, 537 (1993).  A trial court's failure to grant a motion for severance of co-defendants' trials amounts to a violation of due process only where there exists a "serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence."  *Cardenas-Borbon*, 2014 WL 793629, at *14 (quoting *Zafiro*, 506 U.S. at 539).  Petitioner does not allege, and the record does not reflect that these are the circumstances here.  Moreover,

> [a] defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial.  *See Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).  Nor does he have a right to a separate trial merely because defendants present antagonistic defenses. *See United States v. Day,* 789 F.2d 1217, 1224 (6th Cir. 1986) (holding that absent some indication that the alleged antagonistic defendants misled or confused the jury, the mere fact that co-defendants blame each other does not compel severance). Courts should grant a severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933. Granting or denying severance is within the trial judge's discretion. *See Glinsey v. Parker*, 491 F.2d 337, 343 (6th Cir.1974). And, a state trial court's alleged abuse of discretion, without more, is not a constitutional violation. *See Sinistaj v. Burt*, 66 F.3d 804, 805, 808 (6th Cir. 1995).

*Standford v. Parker,* 266 F.3d 442, 458-59 (6th Cir. 2001).

> [S]everance is generally mandated only in three situations: (1) where there is compelling evidence admitted against a codefendant which would not otherwise be admissible against the defendant; (2) where the sheer number of defendants and charges makes it impossible for the jury to separate the issues involved; and (3) where the defendant's involvement in the crime is significantly different in scope or magnitude from that of his codefendants. *See United States v. Blankenship*, 382 F.3d 1110, 1123–25 (11th Cir. 2004).

*Cardenas-Borbon*, 2014 WL 793629, at *14.

Petitioner maintains that the trial court violated his due process rights when it denied his request for a severance of trials because most of the evidence presented by the prosecution implicated his co-defendant, unduly prejudicing the Petitioner, and due to admission of evidence regarding Conley's involvement in a prior double homicide.  Still, the record does not indicate state or federal law mandated a severance of trials on this basis.  Moreover, evidence indicated that, less than an hour after Gervins' murder, Petitioner told Dantzler that he had just been with co-defendant "Twice" and had "shot a little deer."  *State v. Kelly*, 105 N.E.3d at 534.  Petitioner told Rayford that he had shot Gervins and Gervins had to be killed because Gervins "was going 'to tell on some shit that went down.'"  Petitioner has failed to establish that he was denied the effective assistance of counsel based on his attorney's failure to renew the motion for a severance at the close of the State's case.  He likewise has failed to establish cause for his procedural default of claim one.

## V.  Claims Three, Four, Five, and Six

Petitioner asserts that the evidence is constitutionally insufficient to sustain his convictions and that his convictions are against the manifest weight of the evidence.

The latter claim does not provide a basis for federal habeas corpus relief.  *See Taylor v. Warden, Lebanon Corr. Inst.*, No. 2:16-cv-237, 2017 WL 1163858, at *10 (S.D. Ohio March 29, 2017) (citing *Williams v. Jenkins*, No. 1:15cv00567, 2016 WL 2583803, at *7 (N.D. Ohio Feb. 22, 2016)) (citing *Nash v. Eberlin*, 258 F. App'x 761, 765, n. 4 (6th Cir. 2007)); *Norton v. Sloan*, No. 1:16-cv-854, 2016 WL 525561, at *5 (N.D. Ohio Feb. 9, 2017) (citing *Ross v. Pineda*, No. 3:10-cv-391, 2011 WL 1337102, at *3 (S.D. Ohio)) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law.").

Under Ohio law, a claim that a verdict was against the manifest weight of the evidence—as opposed to one based upon insufficient evidence—requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Because a federal habeas court does not function as an additional state appellate court that is vested with the authority to conduct such an exhaustive review, Petitioner's claim that his convictions are against the manifest weight of the evidence cannot be considered by this Court.

The state appellate court rejected Petitioner's claim of insufficiency of the evidence in relevant part as follows:

> {¶ 79} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). *See also, State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175, 485 N.E.2d 717.

> ¶ 80} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260, 674 N.E.2d 1159.

{¶ 81} Appellant was convicted of murder, in violation of R.C. § 2903.02(A), which states:

(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

{¶ 82} Appellant was also convicted of intimidation, in violation of R.C. § 2921.04(B)(2), having weapons while under disability and firearm specifications.

{¶ 83} Upon review, we find that while Appellant does state in his Assignment of Error that he is challenging these convictions, he does not address these convictions separately in his argument. Pursuant to App.R. 12(A)(2), this Court may disregard an assignment of error if the party raising it fails to argue the assignment separately in his or her brief, as required by App.R. 16. This Court has no duty to rule on assignments of error that are not adequately briefed. *In re Brown* (1989), 60 Ohio App.3d 136, 139, 573 N.E.2d 1217; *North Coast Cookies, Inc. v. Sweet Temptations, Inc.* (1984), 16 Ohio App.3d 342, 476 N.E.2d 388; also *see Newburgh Heights v. Wheatley* (Oct. 29, 1998), Cuyahoga App. No. 72422, unreported. We therefore decline, in the absence of any argument or citation to legal authority, to address Appellant's challenge to his convictions on the intimidation, having weapons while under disability and firearm specification counts other than as they relate to his murder conviction.

{¶ 84} Appellant, in the case sub judice, argues that the only evidence against him were the cell phone records indicating that his phone was in the vicinity of the shooting when it occurred and his jail telephone call with Dantzler. Appellant argues that his alleged statements to Rayford admitting that he killed Gervins were fabrications.

{¶ 85} Upon review, this Court finds based on the testimony and evidence presented at trial as set forth above, that the State presented proof beyond a reasonable doubt that Appellant was guilty of the murder of Dontee Gervins.

{¶ 86} The jury heard testimony from Lamonte Rayford that Appellant admitted to him that he was involved in Gervins' murder. Further, evidence was presented as to cell phone tower data which placed Appellant, his co-defendant Conley and Gervins together in Delaware County. There was also ample evidence presented that Gervins was the only witness to the Gault Street shootings who could have testified against Jonathan Dantzler, who was in jail awaiting trial, and who could identify and inform the police that Appellant was also involved in those shootings. Appellant also received a call from Dantzler, who is Appellant's brother, from the jail less than an hour after Gervins was shot. During this call Appellant informed his brother that he was "just with Twice" and that they "got [sic] a little deer" and that he "hope they shoot good." (T. at 1168–1169).

{¶ 87} The jury also heard ample evidence as to motive in this case. As stated above, Gervins could identify co-defendant Conley, Appellant's cousin, as one of the shootings in the Gault Street crimes and could testify against Dantzler, Appellant's brother.

{¶ 88} The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witnesses' credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. McGregor*, 5th Dist. Ashland No. 15-COA-023, 2016-Ohio-3082, 2016 WL 2942992, ¶ 10, citing *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 2000 WL 297252 (Mar. 23, 2000). Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.* Our review of the entire record reveals no significant inconsistencies or other conflicts in the State's evidence which would demonstrate a lack of credibility of the witnesses sufficient to find the jury lost its way to finding Appellant guilty.

{¶ 89} Based on the foregoing, together with all of the evidence presented, we find that Appellant's murder conviction was supported by sufficient evidence and that the jury did not lose its way in finding Appellant guilty beyond a reasonable doubt.

\*\*\*

Appellant argues that his convictions on the criminal gang specifications were against the [] sufficiency of the evidence.

{¶ 92} A gang specification under R.C. § 2941.142 mandates a prison term of one, two, or three years on an offender who commits a felony "that is an offense of violence while participating in a criminal gang."

{¶ 93} Regarding the existence of a criminal gang requirement of the gang specification, the state must prove that the "persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity." R.C. 2923.41(A)(3). *See State v. Johnson*, 10th Dist. No. 07AP-538, 2008-Ohio-590, 2008 WL 384231, ¶ 41 (vacating the appellant's conviction on gang specification because of insufficient evidence for jury to find pattern of criminal gang activity due to absence of testimony that members of the appellant's gang committed any of the type of crimes listed in R.C. 2923.41(B)(1) ); *State v. Bickerstaff*, 7th Dist. No. 09 JE 33, 2011-Ohio-1345, 2011 WL 1004925, ¶ 58–60 (finding sufficient evidence to establish pattern of criminal gang activity based on police detective and gang member testimony outlining the felony offenses committed by members of the appellant's gang). Further, the state must demonstrate the offense of violence was committed while participating in that criminal gang. *See State v. Smith*, 6th Dist. No. L-15-1027, 2017-Ohio-776, 2017 WL 837080, ¶ 49–50 (finding sufficient evidence to support conclusion that the offenses were committed while the appellant participated in a criminal gang based

on testimony regarding local gang culture, the appellant's affiliation with a criminal gang, and the connection between violence and gang status); *State v. Yates*, 8th Dist. No. 96774, 2012-Ohio-919, 2012 WL 759201, ¶ 22 (finding sufficient evidence that shooting was related to gang activity where the appellant and other criminal gang members were "patrolling their territory" in a vehicle when "they came upon the [pedestrian] victims" and the appellant "exchanged words" with one of the pedestrians before shooting). Thus, gang-related testimony is not only relevant but necessary for the state to prove a gang specification.

{¶ 94} In the instant case, to prove the gang specification, the state needed to show that Appellant committed the murder "while participating in a criminal gang." See R.C. § 2941.142. Here, evidence demonstrated that Jonathan Dantzler, Richard Bland, Reginald Conley and Lamonte Rayford were members of a gang known as the "ATM Crips" and that such gang is a criminal gang. Conley and Dantzler both have ATM Crips tattoos. Appellant is the brother of Dantzler and cousin of Conley. The jury found Appellant complicit in the murder of Gervins. Testimony was presented that Gervin's murder was committed to prevent him from testifying against Conley and Dantzler for their roles in the Gault Street shootings.

{¶ 95} Collectively, evidence of the above facts reasonably demonstrates that Appellant committed or was complicit in the act of murder, at least in part, for the purpose of assisting and/or furthering the interests of a criminal gang. Therefore, sufficient evidence was presented at trial for the jury to find that the shooting occurred while Appellant was participating in a criminal gang.

{¶ 96} For these reasons, we find that sufficient evidence supported Appellant's criminal gang specification convictions[.]

*State v. Kelly*, 105 N.E.3d at 540-43.

### a. Waiver

Petitioner has waived his claim of insufficiency of evidence as it applies to his convictions on intimidation, having a weapon while under disability, and firearm specification counts, except as applied to his murder conviction, due to his failure to separately brief the issues as required under Ohio Appellate Rule 16.[1] The state appellate court explicitly enforced this

---

[1] Rule 16(A) provides:

(A) Brief of the Appellant. The appellant shall include in its brief, under the headings and in the order indicated, all of the following:

state procedural rule when it refused to addressed the merits of his claims under Rule 12(A)(2) of the Ohio Rules of Appellate Procedure, providing the appellate court may disregard an assignment of error if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief as required under App.R. 16(A). Ohio App. R. 12(A)(2). Petitioner has thereby procedurally defaulted these claims for review in these proceedings. *See Campbell v. Bunting*, No. 1:14-cv-1187, 2015 WL 4984871, at * (N.D. Ohio Aug. 19, 2015) (Ohio Appellate Rule 16 is an adequate and independent ground of decision) (citations omitted); *Boynton v. Sheets*, No. 1:11-cv-2810, 2013 WL 1742711, at *11 (N.D. Ohio March 5, 2013) (enforcing this same procedural default). Petitioner has failed to establish cause for his procedural default. This Court will not address Petitioner's claim of insufficiency of the evidence, except as it applies to his murder conviction.

---

(1) A table of contents, with page references.
(2) A table of cases alphabetically arranged, statutes, and other authorities cited, with references to the pages of the brief where cited.

(3) A statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected.

(4) A statement of the issues presented for review, with references to the assignments of error to which each issue relates.

(5) A statement of the case briefly describing the nature of the case, the course of proceedings, and the disposition in the court below.

(6) A statement of facts relevant to the assignments of error presented for review, with appropriate references to the record in accordance with division (D) of this rule.

(7) An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. The argument may be preceded by a summary.

(8) A conclusion briefly stating the precise relief sought.

**b. Merits**

A criminal defendant may only can be convicted consistent with the United States Constitution if there is sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In determining whether the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume—even if it does not appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* (quoting *Jackson*, at 326).

Moreover, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Second, and even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This Court may grant relief on petitioner's claim only if the state appellate court was "'objectively unreasonable' in concluding that a rational trier of fact could have found [petitioner] guilty

beyond a reasonable doubt." *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). This is a substantial hurdle for a habeas petitioner to overcome, and Petitioner has failed to do so here.

Petitioner argues that the State failed to establish he had any motive to kill Gervins and presented only ambiguous or incredible circumstantial evidence of guilt. Petitioner also argues that the State failed to produce any evidence establishing his guilt of the gang specification under O.R.C. § 2941.142. (*See Traverse*, ECF No. 15, PAGEID # 2270-71.) In view of the facts set forth by the Ohio Court of Appeals, this Court does not agree. To the contrary, when viewing the evidence in the light most favorable to the prosecution, this Court agrees that the evidence is constitutionally sufficient to sustain Petitioner's convictions. Further, circumstantial evidence alone will be sufficient to support a conviction. *See Gipson v. Sheldon*, 659 F. App'x 871, 877 (6th Cir. 2016) (citing *Holland v. United States*, 348 U.S. 121, 139-40 (1954); *Tucker v. Palmer*, 541 F.3d 652, 657 (6th Cir. 2008)). Here, as discussed, the State introduced Petitioner's own incriminating statements admitting his involvement in Gervins' murder. Petitioner has failed to establish that the state appellate court contravened or unreasonably applied federal law when it rejected Petitioner's claim of insufficiency of the evidence.

Petitioner's claim of insufficiency of the evidence is without merit.

## VI.  Recommended Disposition

For the reasons set forth above, it therefore is **RECOMMENDED** that this action be **DISMISSED.**

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

_s/ Elizabeth A. Preston Deavers__
Elizabeth A. Preston Deavers
Chief United States Magistrate Judge